**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>800 K Street N.W., Suite 1000<br>Washington, D.C. 20001<br><br>                Plaintiff,<br><br>        v.<br><br>INTERNAL REVENUE SERVICE<br>U.S. DEPARTMENT OF TREASURY<br>1111 Constitution Avenue N.W.<br>Washington, D.C. 20224,<br><br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:26-cv-2104-RBW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### INTRODUCTION

1. "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." *R. A. V. v. St. Paul*, 505 U.S. 377, 392 (1992).

2. So, "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The government cannot "use the power of the State to punish or suppress disfavored expression." *Id*. at 188.

3. Similarly, the First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quotation omitted). The government may not burden that freedom without showing "compelling state interests, unrelated to the suppression of ideas" that it cannot achieve through "less restrictive" means. *Id*. at 648.

4.      This case presents a textbook example of First Amendment violations for viewpoint discrimination and infringement on associational activity. The Internal Revenue Service (IRS) issued a directive targeting flyers, posters, and other paraphernalia of one type only: those promoting Plaintiff National Treasury Employees Union (NTEU), which has represented IRS employees for nearly a century. The IRS is removing NTEU materials—and NTEU materials only—from workplace common spaces and employees' personal workstations, where other types of materials unrelated to government business remain allowed. The IRS is removing (or ordering IRS employees to remove) NTEU materials to send a message of unfavored status and to deter associational activity that the First Amendment protects.

5.      The directive both targets NTEU materials being displayed for removal and prohibits such material from being displayed in the future. The latter is a prior restraint affecting tens of thousands of NTEU members nationwide and a burden on their right to associate.

6.      In addition to prohibiting the display of NTEU materials in the workplace, the IRS has blocked messages from the @nteu.org domain from its email system. IRS employees can neither send messages to, nor receive messages from, NTEU with their @IRS.gov email addresses.

7.      More still, the IRS has blocked access to NTEU's website, NTEU.org, from IRS computer systems. When IRS employees attempt to visit NTEU.org from their work computers, they receive a message on the screen that the site contains "potentially damaging content."

8.      NTEU represents federal workers in thirty-eight federal agencies and departments, including tens of thousands of employees at the IRS. The IRS is NTEU's largest bargaining unit, comprising roughly half of the workers that NTEU represents. And it is NTEU's

oldest bargaining unit: NTEU has represented IRS employees since long before Congress created a statutory right to organize federal workers in 1978.

9. NTEU has stood up against this Administration's anti-federal worker policies and actions, including in the courts. In response, this Administration has targeted NTEU repeatedly. And it has tried to hit NTEU where it hurts the most: with its largest bargaining unit, the IRS.

10. On March 27, 2025, this Administration stripped the collective-bargaining rights of three-quarters of the federal workers who had them through Executive Order No. 14,251, Exclusions from the Federal Labor-Management Relations Programs (Mar. 27, 2025). The Executive Order affected nearly two-thirds of the workers that NTEU represents, including its IRS bargaining unit. The Order invoked national security as the basis for the action, even though the IRS has no plausible connection to national security work. NTEU has challenged the Executive Order on First Amendment and ultra vires grounds in a separate lawsuit that remains pending.

11. A White House Fact Sheet issued with the Executive Order indicated that the Order was driven by animus against "[c]ertain Federal unions [] declaring war on President Trump's agenda" and a view that collective-bargaining "enables hostile Federal unions to obstruct agency management." In NTEU's separate litigation challenging the Executive Order, the government has not disputed that NTEU is one of the "hostile Federal unions" to which the Fact Sheet refers.

12. As a further indication that the Executive Order targeted NTEU, the morning after the Order issued, the Treasury Department sued a local NTEU chapter in Kentucky. The lawsuit, like the Executive Order, referred to NTEU as a "hostile union" and sought a judgment that NTEU's national collective-bargaining agreement with the IRS was void in light of the Order.

*See* Compl., *U.S. Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky.). The Administration's preemptive lawsuit against NTEU was dismissed for lack of standing. *U.S. Dep't of Treasury v. NTEU Ch. 73*, 783 F. Supp. 3d 991 (E.D. Ky. 2025).

13. The IRS's restrictions on NTEU-related speech here are the latest chapter in the Administration's continued attack on NTEU, and they strike even more deeply at First Amendment freedoms. Now, the IRS is not only trying to prevent NTEU from carrying out the statutory function that it was elected to perform as the IRS employees' exclusive bargaining representative, but it is also trying to prevent every individual IRS employee from communicating with their NTEU representatives or even expressing support for NTEU as their workplace advocate.

14. The IRS is thus trying to literally erase NTEU from the same workplaces in which the Union has advocated for its IRS members since 1938. The IRS's actions are incompatible with the First Amendment on multiple grounds and must be enjoined.

## JURISDICTION

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

16. Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is headquartered in Washington, D.C. So is the IRS, and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C.

## PARTIES

17. Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street, N.W., Suite 1000, Washington, D.C. 20001. NTEU represents tens of thousands of federal employees in thirty-eight departments and agencies, including at the IRS.

4

NTEU negotiates collective-bargaining agreements with agency employers, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights.

18.     NTEU brings this action on behalf of itself and the IRS employees that it represents. The IRS's First Amendment viewpoint discrimination and its burdens on First Amendment associational rights plainly injure NTEU and its members, including those described in this complaint.

19.     Defendant IRS is a federal agency headquartered in Washington, D.C. It implemented the restrictions on speech at the center of this complaint.

**STATEMENT OF CLAIMS**

**The IRS Directive Banning the Display of NTEU Materials (Materials Ban)**

20.     The Materials Ban is reflected in a May 29, 2026 email from the Acting Chief of IRS Facilities Management & Security Services (FMSS) to all FMSS employees. That email, attached as Exhibit 1 to this complaint, states, in relevant part:

> IRS leadership has identified instances of NTEU flyers, posters, and other paraphernalia remaining in place at IRS posts of duty. Given the high-profile nature of these materials as they relate to the President's Executive Order, and given IRS senior leadership's prior directive to ensure all of these materials have been removed, I've been asked to ensure that recurring instances of NTEU materials in the workplace be addressed immediately. Therefore, I'm tasking all hands with the following:
>
> - Please conduct a walkthrough of your post of duty and remove any and all NTEU materials you observe, by the end of next week (June 5th).
> - If the material is inaccessible (e.g. inside a locked bulletin board, on the interior of a transparent, locked door, etc.) please take whatever steps are necessary to access and remove the material (within reason – obviously don't break or vandalize anything to get to it).
> - If you are traveling to a site that does not have resident FMSS staff, please take the time to conduct a walkthrough there as well while you are on -site.

- Please confirm through your management chain, by building code, where and when walkthroughs have been completed.

. . . IRS leadership is separately engaging other business units to assist in locations where FMSS does not have on-site staff. I realize that employees may re-post materials so please continue to be vigilant and remove items that may reappear.

21.     Illustrating IRS leadership's enlisting of its other units to carry out—expeditiously—its Materials Ban, on June 8, 2026, an IRS supervisor in a southwest state emailed his supervisees to state:

I received an email today regarding NTEU signage in the [post of duty]. FMSS has requested that where they do not have [a] physical presence, that management assist with compliance on the removal of any NTEU signage. [The supervisor's division] has agreed to support this action. Please make sure that if you have any NTEU signage within the POD[,] that it is removed by COB Wednesday, 06/10/2026.

**The IRS's Implementation of the Materials Ban**

22.     The Materials Ban covers two types of areas within IRS workplaces where non-work materials are typically posted.

23.     The first area consists of common spaces—in practice, that is primarily bulletin boards in common spaces on which employees have been free to post materials without seeking approval. Employees have used these general bulletin boards to post a broad range of materials in addition to NTEU materials—such as materials regarding church events, materials advertising lawncare or other services, children's organizations like camps, materials selling goods like Girl Scout cookies, and holiday-related materials.

24.     The second area that the Materials Ban covers is individual employee workstations, i.e., cubicles. On the outside of these workstations, employees have been free to display whatever they wish so long as the material is not profane or vulgar, or advocating for a political candidate. Employees often display, on the outside of their cubicles, for example, patriotic materials like American flags, sports paraphernalia, or holiday decorations, in addition

to NTEU materials. On the inside of workstations, employees are likewise free to display what they wish, as long as the material is not profane, vulgar, or advocating for a political candidate. Materials that have been on display inside of employee cubicles, apart from NTEU materials, include those related to television shows, academic institutions, sororities and fraternities, employees' families, and sports.

25.     The IRS's implementation of its Materials Ban has been swift and aggressive, further underscoring to its employees NTEU's disfavored status.

26.     On June 5, 2026, FMSS dispatched two employees to an IRS facility in Decatur, Georgia, where Lakisha Murphy serves as the local NTEU Chapter President. According to Ms. Murphy, sending two FMSS employees to her very small office building, standing alone, was excessive. These two FMSS employees walked around the building and told at least two other employees present to not display anything related to NTEU. The FMSS employees walked from cubicle to cubicle to relay this message to even those employees who were not displaying any NTEU materials at all to deter them from putting up such materials in the future. And both FMSS employees came to Ms. Murphy's cubicle to instruct her to remove her NTEU materials; otherwise, they said, they would remove those materials at the end of the workday. That is what occurred: FMSS removed NTEU flags from three other cubicles and disposed of them in the men's restroom. One flag was returned upon Ms. Murphy's request, but the others could not be retrieved from the restroom waste.

27.     Similarly, on June 4, 2026, FMSS made its presence felt at an IRS facility in Horsham, PA. While the local NTEU Chapter President, Thomas Parise, was in the office but occupied with other tasks, an FMSS employee removed NTEU flyers from the outside of his cubicle. Mr. Parise sent an email seeking the return of his NTEU materials. An FMSS Section

Chief confirmed to him that his materials would not be returned, saying that the "directive is coming from FMSS HQ."

28.    At a large IRS campus in Kansas City, MO, where Shannon Ellis is the local NTEU Chapter President, FMSS has been particularly aggressive in targeting NTEU materials. The local NTEU chapter would regularly set up a table at the facility's cafeteria during lunchtime as a way of sharing NTEU information and inviting employees to speak with them about workplace issues. The chapter had NTEU flyers at the table. The cafeteria is a location where employees would sometimes put flyers to advertise a cause or event. In early June 2026, as on previous occasions, the NTEU chapter had set up a table in the cafeteria with NTEU flyers on previous occasions. But on this occasion in early June, after the issuance of the Materials Ban, an FMSS employee took the NTEU flyers at the chapter's table, crumpled them up, and threw them away.

**The IRS's Agreement to Pause the Materials Ban and Violation of the Parties' Stipulation**

29.    NTEU filed its initial complaint in this case on June 15, 2026, alleging that the Materials Ban was in violation of the First Amendment.

30.    On June 24, 2026, NTEU filed a motion for a preliminary injunction, requesting immediate relief rescinding the Materials Ban and enjoining further implementation. NTEU also requested that, to the extent possible, the IRS restore any NTEU materials removed or ordered to be removed.

31.    On June 30, 2026, NTEU and the IRS entered into a joint stipulation (Stipulation) in which the IRS agreed to "pause further implementation of its directive ordering the removal of NTEU materials from the workplace," to allow IRS employees to "resume putting NTEU materials on their individual workstations and in common areas where they were allowed before the IRS directive's issuance," and "return to employees the NTEU materials that it has

confiscated pursuant to the directive, to the extent that the IRS has not already lost, destroyed, or disposed of those materials."

32.    In the Stipulation, the Parties agreed that IRS would also provide "at least 5 days" advance notice before reimplementing the Materials Ban "in its initial form or in a revised form," and NTEU would then promptly notify the Court whether it intended to renew its motion for a preliminary injunction.

33.    On July 3, 2026, an NTEU member notified NTEU President Doreen Greenwald that the Stipulation had already been violated. At an IRS facility in Fresno, California, NTEU flyers placed on bulletin boards in breakrooms on July 1, 2026, were removed by July 2, 2026, at the direction of the IRS Site Coordinator.

34.    On July 3, 2026, the NTEU member also notified members of the IRS's management that the Stipulation had been violated.

35.    Early the next week, on or around July 7, 2026, the Stipulation was yet again violated at that facility—NTEU flyers were removed from breakrooms on two floors, and the NTEU member again notified members of the IRS's management.

**The IRS's Restrictions on Interacting with NTEU Through IRS Computer Systems (Domain Block)**

36.    Around June 10, 2026, IRS employees began to notice that they were blocked from visiting NTEU's website on their work computers. When they attempt to visit NTEU.org, they are taken to an IRS page that states, in bold white letters on a red banner, "**The requested web site is in a highly restricted category.**" Below the banner, it says, "The site nteu.org is categorized as **Potentially Damaging Content**. The IRS has restricted access to this category with very limited or no exceptions."

9

37.     NTEU.org is a valuable resource for NTEU chapter leaders and NTEU members. On the site, members can find the latest news about what NTEU is doing to protect their rights in the workplace and links to collective bargaining agreements. NTEU.org also provides chapter leaders access to messages from the NTEU National President, membership reports, and data on disciplinary actions that the IRS has taken against employees. And IRS employees who are not NTEU members can visit the site to become members by clicking the "Join NTEU" link.

38.     IRS policy permits limited personal use of government-furnished information-technology (IT) equipment and resources during non-duty time. IRS employees are prohibited from using government-furnished IT equipment and resources to access their personal email, the social media service TikTok, and other specific categories of websites, such as pornography and dating sites. Under this policy, IRS employees always have been permitted to visit NTEU.org using government-furnished IT equipment and resources during non-duty time—until now.

39.     Common and permissible personal uses of government-furnished IT equipment and resources include online shopping and booking personal travel.

40.     While access to NTEU's website is blocked, IRS employees can access, for example, the video streaming website YouTube.com; the website for an anti-union organization, the National Right to Work Legal Defense Foundation (nrtw.org); the website for the Girl Scouts (girlscouts.org); and websites for local churches.

41.     Around June 17, 2026, IRS employees serving as NTEU chapter representatives began to notice that NTEU staff members with @NTEU.org email addresses were not receiving the chapter representatives' emails from @IRS.gov email addresses, and vice versa.

42.    IRS employees can and do correspond via email with individuals outside of IRS. For example, they email with taxpayers and with employees in other federal agencies. They may also email other associations and organizations.

43.    Around the same time, NTEU staff members serving as IRS employees' legal representatives in pending matters, including equal employment opportunity (EEO) cases and cases before the Merit Systems Protection Board (MSPB), realized that their emails to their counterparts representing the IRS in those matters, as well as to their IRS employee clients, were not going through. Nor were the messages from the IRS representatives to NTEU staff members.

44.    When one NTEU attorney who had filed an MSPB case on behalf of an IRS employee engaged in settlement discussions over the phone with the agency attorney, the agency attorney told him that she would email him a document. After a day or two, however, the NTEU attorney had not received the document, even though the agency attorney insisted that she sent it. After another few days, the NTEU attorney told that agency attorney that he would go to the MSPB judge if he continued to not receive the document. Then, another day or two later, he was able to send emails to and receive them from the agency attorney.

45.    When an IRS employee's email is blocked from being sent, such as when an email contains personally identifiable information, the employee typically receives an error message indicating that the email did not go through. But neither NTEU staff members attempting to email IRS employees, nor IRS employees attempting to email NTEU staff members, received any notification that their emails bounced back or failed to send.

46.    NTEU's national office, including NTEU's National President, communicates via email with IRS management from time to time on workplace issues. For example, the National

11

President has used email to report unsafe building conditions that need immediate attention to the IRS Commissioner.

47.    NTEU's national office has in the past communicated with IRS employees who are NTEU members at their @IRS.gov email addresses about workplace issues and what NTEU is doing to address them. And NTEU would like to communicate with its members at their @IRS.gov email addresses in the future.

48.    Around June 23, 2026, the IRS unblocked emails between @NTEU.org email addresses and General Legal Services attorneys in the IRS Office of Chief Counsel. But emails between @NTEU.org email addresses and other @IRS.gov email addresses, including those for reasonable accommodation coordinators and bargaining-unit employees, remained blocked.

49.    NTEU counsel raised the Domain Block issue to government counsel and the Court on July 1, 2026. On July 7, 2026, counsel for the IRS informed NTEU that the IRS had voluntarily lifted the block on emails between @NTEU.org email addresses and @IRS.gov email addresses for the following limited categories of personnel: IRS managers, employee relations and human resources personnel, reasonable accommodation coordinators, and attorneys in the Office of Chief Counsel. The IRS did not, however, lift the block on emails between NTEU staff and IRS bargaining-unit employees or the block on visiting NTEU's website.

50.    Documents relevant to cases involving discrimination or disciplinary actions against employees, such as emails between the employee and management or letters memorializing personnel actions, reside on IRS servers. IRS employees who are NTEU chapter leaders—like Sharon Burns, president of NTEU Chapter 85 representing IRS workers in Las Vegas—use their @IRS.gov email addresses to send such case-related documents to NTEU attorneys who are assisting them with those cases. The email block places an obstacle in the way

of getting important documents to the NTEU attorneys who need them to adequately represent employees.

51.     Sending case-related documents to NTEU via IRS email was a longstanding practice that IRS management historically has permitted.

**The Irreparable Harm to NTEU and Its Members**

52.     NTEU and its members, including those referenced in this complaint, have lost their ability to speak in favor of their union, to communicate with one another via @IRS.gov email, and to access the valuable union resources on NTEU.org. This ongoing loss, moreover, comes during a time in which the government is attacking NTEU and refusing to recognize its collective-bargaining relationship with NTEU. Indeed, it comes at a time when the Administration is taking aim at the entire federal sector labor relations scheme that Congress created. Neither NTEU nor its members will get back these lost opportunities to advocate for and to show support for their union.

53.     "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

54.     "When a government employer's restrictions on employee speech tread on First Amendment interests, those restrictions work irreparable injury." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022).

55.     This is unquestionably true with the type of broad prior restraint that is at issue here. The Materials Ban and Domain Block prohibit speech on a matter of public concern, speech that is pro-union, at a pivotal time for NTEU. These restrictions come at a time when NTEU is under attack from this Administration and when the IRS is aggressively attempting to erase NTEU's presence—and denying NTEU members their rights—in the workplace.

**The First Amendment Framework**

56.     If a public employee speaks as a private citizen on a matter of public concern, a court will balance that employee's interests against the government's to determine if the First Amendment's protections apply.

57.     Most, if not nearly all, union-related speech—including speech about union organizing—is speech on matters of public concern. *See, e.g., Janus v. AFSCME, Council 31,* 585 U.S. 878, 912-13 (2018) (stressing that public education unions' positions in collective bargaining address matters "of great public importance," including "how public money is spent," "education policy," "child welfare, healthcare, and minority rights"); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) ("Issues regarding the operation of government, including issues of union organization, are often considered matters of public concern.").

58.     The Materials Ban broadly prohibits present and future private speech in the form of NTEU flyers, posters, and other written material. And those materials contain speech on a matter of public concern: they promote NTEU to members and non-members alike at a time when the IRS is refusing to recognize the union. Thus, the materials promote union solidarity among members and union organizing to non-members.

59.     The Domain Block broadly restricts employees' right to speak and their right to receive speech in the present and in the future. That speech addresses union-related matters of public concern.

60.     The Supreme Court's framework under *United States v. NTEU*, 513 U.S. 454, 468 (1995), provides the standards for assessing whether the Materials Ban and Domain Block violate IRS employees' First Amendment rights, given that they are broad prior restraints affecting tens of thousands of NTEU-represented workers nationwide, as opposed to an isolated

disciplinary situation for which the framework established under *Pickering v. Board of Education,* 391 U.S. 563 (1968), would govern.

61.     The government's burden when seeking to justify a broad deterrent on speech that affects an entire group of its employees is greater than when it is defending an individual disciplinary decision. *United States v. NTEU*, 513 U.S. 454, 468 (1995) ("[U]nlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens."); *see also NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect.") (citations omitted).

62.     In cases involving a broad ban on group speech, "the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571). This is an exacting standard.

63.     Here, NTEU materials remaining in common space and employee workstations at IRS facilities have no "impact on the actual operation of the Government." Indeed, those types of signs and posters have been in IRS workplaces for decades. And it cannot be that continuing to promote NTEU adversely affects IRS's work; indeed, Congress's explicit finding is that unions have a positive effect in federal workplaces. 5 U.S.C. § 7101(a).

64.     Similarly, continuing to allow IRS employees to correspond with NTEU via email and visit NTEU's website using government computers and internet has no "impact on the actual operation of the Government." These activities no more interfere with the actual operation of government than permissible activities like online shopping, booking personal travel, or

watching YouTube videos. IRS policy explicitly permits limited personal use of IRS computers and internet.

65.    Because the expressive activities now restricted under the Materials Ban and the Domain Block have no "impact on the actual operation of the Government," there is nothing on the government's side of the scale.

66.    On the other side of the scale is the ability of tens of thousands of NTEU-represented workers across the country—and, more broadly, the entire IRS workforce—to show support for the union that had a nearly century-old history advocating for IRS employees, communicate with the union, and receive union-related news and other information on NTEU's website. That is especially important now, where in the public sphere the Administration has painted NTEU as "hostile" and is refusing to recognize the union.

67.    When an outside speaker, like a union, wishes to access government property for expressive activity, "forum analysis" applies to determine the legality of restrictions on speech on the property. *See Price v. Garland*, 45 F.4th 1059, 1067 (D.C. Cir. 2022).

68.    An IRS office constitutes a nonpublic forum. *Id.* at 1068 (listing "offices" as an example of government property that is a nonpublic forum).

69.    The IRS's email system, like a school's internal mail system, also constitutes a nonpublic forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983).

70.    The internet accessible for limited personal use on government computers constitutes a nonpublic forum. *See Parents, Families, & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 899 (W.D. Mo. 2012) (stating that school district's internet access system in its library is a nonpublic forum).

71. To comply with the First Amendment, speech regulations in a nonpublic forum must be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46.

72. "[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1321 (11th Cir. 2005) (citing *Perry Educ. Ass'n*, 460 U.S. at 45).

73. The Materials Ban and the Domain Block target NTEU specifically because of NTEU's viewpoint. The Materials Ban and Domain Block suppress NTEU's views that IRS workers still have a union, despite the Executive Order stripping them of formal collective bargaining rights; that IRS employees should have a say in workplace issues; and that NTEU continues to hold the IRS accountable when it violates employees' rights.

74. In addition, the Materials Ban and the Domain block are unreasonable restrictions on speech. NTEU materials have been on display in IRS workplaces, and NTEU has been able to communicate with IRS employees at their @IRS.gov email addresses, for decades—without disrupting the agency's work. And the IRS unreasonably blocks NTEU's website while allowing IRS employees to access YouTube and online shopping websites.

75. IRS employees' First Amendment freedom to associate with NTEU is assessed under *Pickering/NTEU*. *See, e.g.*, *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (applying *Pickering* balancing to "free association claims based on expressive association"); *Cobb v. Pozzi*, 363 F.3d 89, 102–03 (2d Cir. 2003) (applying balancing test to public employees' First Amendment freedom of association claim); *Edwards v. City of Goldsboro*, 178 F.3d 231, 249 (4th Cir. 1999) ("Logically, the limitations on a public employee's right to associate are 'closely analogous' to the limitations on his right to speak.").

76. As in the assessment of IRS employees' free speech rights under *Pickering/NTEU*, the interests of tens of thousands of IRS employees in associating with their union outweigh the government's interests in banning NTEU materials from the workplace and blocking IRS employees from emailing with NTEU or visiting NTEU's website. IRS employees have engaged in these activities for decades, without undue disruption to IRS operations.

77. As to NTEU's freedom to associate as an institution with IRS employees, the government may not burden that freedom without showing "compelling state interests, unrelated to the suppression of ideas" that it cannot achieve through "less restrictive" means. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

78. The IRS's interests in its Materials Ban and Domain Block are not "unrelated to the suppression of ideas." As the Materials Ban and Domain Block target NTEU specifically, the IRS aims to suppress NTEU's viewpoints on workplace issues.

## CAUSES OF ACTION

**Count 1:  The Materials Ban constitutes viewpoint discrimination in violation of the First Amendment's Free Speech Clause.**

79. The paragraphs above are incorporated and reasserted as if fully set forth herein.

80. The Materials Ban violates a core First Amendment principle: the prohibition on viewpoint discrimination.

81. The Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

18

82. Viewpoint-based sanctions constitute a "blatant and egregious form of content discrimination" that is anathema to the First Amendment. *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quotation marks omitted) (quoting *Rosenberger*, 515 U.S. at 829).

83. "[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination—that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint." *Cook*, 414 F.3d at 1321 (citing *Perry Educ. Ass'n*, 460 U.S. at 45); *accord Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 811 (1985) ("The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a façade for viewpoint-based discrimination.").

84. The IRS's decision to single out NTEU materials with its directive, and to do so after the White House labeled NTEU as a "hostile" union for its resistance to the Administration's anti-worker policies, shows that the IRS is using its power to suppress the protected expression of NTEU and to show that NTEU is disfavored. The First Amendment prohibits such conduct.

85. The Materials Ban targets NTEU materials alone. IRS employees may continue to display materials regarding other organizations, like local churches and the Girl Scouts, on general use bulletin boards. And they may continue to display materials like family photos, sports or college paraphernalia, church materials, and other posters or flyers on the outside and the inside of their workstations.

86. While the IRS may disagree with some of the viewpoints that it attributes to NTEU, the First Amendment does not allow it to punish NTEU based on those viewpoints.

87.     The IRS's First Amendment violations have caused NTEU and its members, including those referenced in this complaint, ongoing and irreparable harm.

88.     The Executive Order described above removes the IRS from the statutory collective-bargaining regime, and the IRS, in turn, no longer participates in any statutory or contractual dispute resolution processes with NTEU. That state of affairs underscores that federal district court is the only forum in which NTEU may meaningfully raise this First Amendment claim.

**Count 2:   The Materials Ban infringes on the First Amendment Freedom of Association.**

89.     The paragraphs above are incorporated and reasserted as if fully set forth herein.

90.     The government may not impose punishments based on protected association. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990).

91.     "Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).

92.     The Materials Ban violates the right to freedom of association under the First Amendment.

93.     The Materials Ban chills IRS employees' willingness to associate with NTEU, thus burdening NTEU's freedom of association. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

94.      NTEU's ability to continue associating with IRS workers has been severely impaired. The ability of NTEU's members at the IRS to associate with NTEU has likewise been harmed, which is an injury that NTEU raises on behalf of those members. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

95.      The IRS's First Amendment violations are causing and will continue to cause ongoing, irreparable harm to NTEU and its members, including those referenced in this complaint.

96.      The Executive Order described above removes the IRS from the statutory collective-bargaining regime, and the IRS, in turn, no longer participates in any statutory or contractual dispute resolution processes with NTEU. That situation underscores that federal district court is the only forum in which NTEU may meaningfully raise this First Amendment claim.

**Count 3: The Domain Block violates the First Amendment's Free Speech Clause.**

97.      The paragraphs above are incorporated and reasserted as if fully set forth herein.

98.      "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Today, one of "the most important places (in a spatial sense) for the exchange of views . . . is cyberspace—the 'vast democratic forums of the Internet.'" *Id.*

99.      The Domain Block violates IRS employees' free speech rights.

100.     In communicating with NTEU from @IRS.gov email addresses and visiting NTEU's website, employees engage in speech on matters of public concern, including issues related to the operation of government, employee rights, and union organizing.

101.     Employees engage in these expressive activities as private citizens, not as part of their duties as IRS employees.

102.     Under *Pickering/NTEU*, the interests of tens of thousands of NTEU-represented workers at the IRS in communicating with NTEU and accessing union information on NTEU.org from their work computers outweigh the government's interest in restricting that activity.

21

Allowing this activity as part of employees' limited personal use of government furnished IT equipment and resources has minimal—if any—impact on the IRS's operations.

103.    The Domain Block further violates NTEU's free speech rights as an organization.

104.    The Domain Block constitutes an unreasonable and viewpoint-discriminatory restriction on speech in a nonpublic forum. It is unreasonable because it allows access to other speech via email and on the internet with no less potential to disrupt the IRS's operations than NTEU's speech. And it constitutes viewpoint discrimination because it targets NTEU specifically to suppress NTEU's viewpoints on, for example, NTEU's continued relevance in IRS workplaces and its disagreement with IRS management's handling of certain workplace issues.

105.    The IRS's First Amendment violations are causing and will continue to cause ongoing, irreparable harm to NTEU and its members, including those referenced in this complaint.

106.    The Executive Order described above removes the IRS from the statutory collective-bargaining regime, and the IRS, in turn, no longer participates in any statutory or contractual dispute resolution processes with NTEU. That situation underscores that federal district court is the only forum in which NTEU may meaningfully raise this First Amendment claim.

**Count 4: The Domain Block infringes on the First Amendment Freedom of Association.**

107.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

108.    The Domain Block violates IRS employees' freedom to associate with NTEU.

109.    Under *Pickering/NTEU*, the interests of tens of thousands of NTEU-represented workers at the IRS in associating with NTEU by communicating with NTEU and accessing union information on NTEU.org from their work computers outweigh the government's interest

in restricting that associational activity. IRS employees have associated with NTEU for decades, with minimal negative effect—likely even a positive effect—in the workplace.

110.    The Domain Block violates NTEU's freedom to associate with its members.

111.    The IRS cannot show that the Domain Block is based on "compelling state interests, unrelated to the suppression of ideas" that it cannot achieve through "less restrictive" means. *See Boy Scouts of Am.*, 530 U.S. at 648. The suppression of ideas—namely speech in favor of NTEU and its positions on workplace issues—is the Domain Block's objective.

112.    The IRS's First Amendment violations are causing and will continue to cause ongoing, irreparable harm to NTEU and its members, including those referenced in this complaint.

113.    The Executive Order described above removes the IRS from the statutory collective-bargaining regime, and the IRS, in turn, no longer participates in any statutory or contractual dispute resolution processes with NTEU. That situation underscores that federal district court is the only forum in which NTEU may meaningfully raise this First Amendment claim.

**REQUEST FOR RELIEF**

Wherefore, Plaintiff NTEU respectfully requests judgment against Defendant IRS:

A.      Declaring that the Materials Ban and Domain Block violate the First Amendment.

B.      Enjoining the IRS from implementing the Materials Ban and Domain Block.

C.      Ordering the IRS to rescind the directive setting forth the Materials Ban and any related guidance.

D.      Ordering the IRS to restore all bargaining-unit IRS employees' ability to send and receive email from @nteu.org email addresses, as well as their access to NTEU's website.

E.      Awarding Plaintiff reasonable attorney fees and costs incurred.

F.      Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Paras N. Shah*
PARAS N. SHAH
General Counsel
D.C. Bar 983881

*/s/ Allison C. Giles*
ALLISON C. GILES
Associate General Counsel
D.C. Bar 439705

*/s/ Jessica Horne*
JESSICA HORNE
Assistant Counsel
D.C. Bar No. 1029732

*/s/ Lindsay Dunn*
LINDSAY DUNN
Assistant Counsel
D.C. Bar 90036066

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org
lindsay.dunn@nteu.org

July 16, 2026                    Counsel for Plaintiff NTEU

25